# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                      No. 08-cr-20092

vs.                                        Hon. Gerald E. Rosen

LORENZO MENDEZ-SANTANA,

        Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S
## MOTION TO WITHDRAW PLEA AND MOTION TO DISMISS INDICTMENT

> At a session of said Court, held in
> the U.S. Courthouse, Detroit, Michigan
> on      May 21, 2009

## I. INTRODUCTION

Defendant Lorenzo Mendez-Santana is charged with unlawful reentry into the United States in violation of 8 U.S.C. § 1326. Defendant, who was previously deported after conviction for the commission of an aggravated felony as defined in 8 U.S.C. § 1102(a)(43), was found to be knowingly and unlawfully in the United States at Dearborn, Michigan, without having obtained the consent of the Attorney General for reapplication of admission into the United States. On December 9, 2008, Defendant filed the instant combined Motion to Withdraw Plea of Guilty and Motion to Dismiss Indictment. The Government filed its response on April 1, 2009. The Court denies Defendant's Motions for the following reasons.

## II.  FACTUAL BACKGROUND

On July 3, 2008, Defendant Lorenzo Mendez-Santana ["Mendez"] pled guilty without a Rule 11 plea agreement to the basic offense of unlawful reentry after deportation in violation of Section 276 of the Immigration and Nationality Act.  8 U.S.C. § 1326(a).  Mendez subsequently moved to dismiss the indictment, arguing that the charge was brought after the applicable statute of limitations period had run.

Mendez, a citizen of Mexico, is an illegal alien.  He entered the United States and was deported back to Mexico on two separate occasions: on or about May 1, 1987, and on or about, April 30, 1994.  The second deportation occurred after Mendez finished serving a four-year sentence for first degree rape in Oregon.  He returned to the United States within several months of his second removal without first receiving approval from the Attorney General as required by law.  Although Mendez was arrested by local law enforcement authorities on various charges and under different aliases between 1987 and 2000, he continued to live and reside in the U.S. at various locations, undetected by immigration authorities.

On January 12, 2000, Mendez was arrested in Brighton, Michigan for credit card possession in violation of Mich. Comp. Law § 750.157P.  He pled guilty to this offense, under the name Mauro Mendez-Santana, and was placed on probation.  On July 9, 2000, the State of Michigan probation department in Livingston County referred Mendez to the

Immigration and Naturalization Service ("INS").[1]  An immigration detainer was placed on Mendez and he was taken into custody.

While in custody, Mendez was processed by immigration officers, fingerprinted and issued a Notice to Appear before an Immigration Judge.  A lien report revealed three state identification numbers as well as an FBI identification number, showing Mendez's criminal history and his various aliases.  However, for unknown reasons, immigration authorities failed to further investigate his deportation history.  Mendez was assigned a new alien registration number (an "A-Number") under the name Mauro Mendez-Santana.  The Notice to Appear, dated July 17, 2000, charged Mendez under Section 212(a)(6)(A)(i) of the Immigration and Nationality Act as amended, as "an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General."  8 U.S.C. § 1182(a)(6)(A)(I).  The Notice made no reference to the prior deportations. Mendez was released on a $1,500 bond pending a hearing before an Immigration Judge.  On January 26, 2001, the Immigration Judge granted Mendez voluntary departure within 120 days, in lieu of removal.  Mendez then failed to depart the U.S. by the ordered date and became subject to an automatic order of deportation.

---

[1]  On March 1, 2003, the INS ceased to exist as a separate agency within the Department of Justice, and its functions were transferred into three new agencies, all of which are part of the Department of Homeland Security ("DHS").  See Homeland Security Act of 2002, Pub. L. No. 107-296, Title XV, 441, 116 Stat. 2135-2192 (codified at 6 U.S.C. § 251).

On February 4, 2008, Mendez was found in Dearborn, Michigan and taken into federal custody. At the time of his arrest, he was found to be in possession of two separate Michigan drivers licenses, one issued to "Lorenzo Mendez-Santana" and one issued to "Mauro Mendez-Santana." On July 3, 2008, he pled guilty before this Court to the offense of being found in the United States after deportation in violation of 8 U.S.C. § 1326. Mendez now seeks to withdraw his plea, claiming that the statute of limitations has expired on the charge. He argues that he was first "found in" the United States by immigration authorities under the meaning of 8 U.S.C. § 1326 in 2000, when "a proper investigation by INS agents . . . would have revealed the same information that was turned over to the U.S. Attorney's office in 2008 by the Immigration and Customs Enforcement agents." (Br. in Supp. of Mot. to Withdraw Plea & Mot. to Dismiss Indictment ¶ 12.) The government counters that Mendez is not entitled to the protection of the statute of limitations, because he actively evaded immigration authorities by using aliases and giving false information.

### III.  DISCUSSION

**A.    APPLICABLE LAW**

Defendant has been charged with a violation of 8 U.S.C. § 1326 which provides in part:

(a) Subject to subsection (b), any alien who—

>    (1) has been denied admission, excluded, deported, or removed or
>    has departed the United States while an order of exclusion,
>    deportation, or removal is outstanding, and thereafter

4

> (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act,
>
> shall be fined under title 18, United States Code, or imprisoned not more than 2 years or both.
>
> (b) Notwithstanding subsection (a), in the case of any alien described in such subsection—
>
>> . . .
>
>> (2) whose removal was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under such title, imprisoned not more than 20 years, or both . . . .

The crime of illegal re-entry is subject to a five-year statute of limitations. 18 U.S.C. § 3282. "The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions." Toussie v. United States, 397 U.S. 112, 114, 90 S. Ct. 858 (1970). The statute of limitations in criminal cases begins to run when the crime is "complete." Id. at 115.

**B.   Whether an alien is "found in" the United States.**

The main issue in this case is whether Mendez was found in the United States when he was taken into custody by immigration authorities in July 2000, or whether his use of a false identity and provision of false information tolled the running of the statute of limitations until his re-discovery in 2008. The Sixth Circuit has not yet squarely

addressed when an alien is deemed to be "found in" the United States by immigration authorities under section 1326.

Most other circuits hold that an alien is "found in" the United States under section 1326 when the physical presence of the alien in the United States is discovered *and* when the identity and status of the previously deported alien is known by federal immigration authorities.  See United States v. Zavala-Mendez, 411 F.3d 1116, 1119 (9th Cir. 2005); United States v. Gomez, 38 F.3d 1031, 1035-36 (8th Cir. 1994); United States v. DiSantillo, 615 F.2d 128, 137 (3d Cir. 1980).  Several circuits have also adopted a constructive knowledge analysis, elaborating that for a defendant to be "found," the government either must have known or, with the "exercise of diligence typical of law enforcement authorities," could have discovered the illegality of the defendant's presence. See United States v. Herrera-Ordones, 190 F.3d 504, 510-11 (7th Cir. 1999); United State v. Bencomo-Castillo, 176 F.3d 1300, 1303 (10th Cir. 1999); United States v. Santana-Castellano, 74 F.3d 593, 598 (5th Cir. 1996); United States v. Rivera-Ventura, 72 F.3d 277, 281-82 (2d Cir. 1995); but see United States v. Uribe-Rios, 558 F.3d 347, 354 (4th Cir. 2009) ("[T]he plain text of section 1326 does not support a theory of constructive knowledge.  An alien violates 8 U.S.C. § 1326 when the alien 'is at any time found in[ ] the United States'—not when the alien is 'found or should have been found' in the country.").

### a. Cases holding that immigration authorities had or should have known of defendant's illegal status.

Mendez relies only on United States v. Gunera, 479 F.3d 373 (5th Cir. 2007) to support his argument that the immigration authorities in this case could have discovered his illegal presence before 2008, through the exercise of diligence typical of law enforcement authorities. In Gunera, the Fifth Circuit held that immigration authorities could reasonably be attributed with actual knowledge that the defendant was present illegally in the United States when a National Automated Immigration Lookout System ("NAILS") report identified him as having a prior deportation based on a conviction for an aggravated felony. 479 F.3d at 377. The defendant, Arturo Gunera, initially entered the United States illegally in 1990. Id. at 375. In 1991, he was convicted of possession of a controlled substance, and after serving six months of a three-year prison sentence, was released and deported to Honduras. Id. After a second removal a year later, he re-entered the United States in 1992. Id. On August 18, 1999, the defendant filed an application for Temporary Protected Status ("TPS") and an application for an employment authorization document ("EAD") with the INS's Texas Service Center. Id. He provided his true name, date of birth, and place of birth, as well as a then-current Texas address. Id. The TPS application was approved and the EAD issued, both under the same A-Number under which Gunera had been deported in 1991. Id. Later, that same year, the Texas Service Center ran a NAILS inquiry based on Gunera's name and date of birth, which revealed the prior conviction and deportation history. Id. On October 1, 1999, the INS sent a letter to Gunera informing him of its intent to deny his TPS application. Id. The letter also informed him that he was required to submit fingerprints if he had not already done so.

Id. Over five years later, on November 23, 2004, Gunera reported to Immigration and Customs Enforcement offices, in response to correspondence requesting that he appear for further processing. Id. Once there, he was arrested, held in custody, and charged with violation of Section 1326. Id. Gunera challenged his indictment on statute of limitations grounds. Id.

The Fifth Circuit reaffirmed its standard for determining when an alien is "found in" the United States for purposes of Section 1326:

> [W]e hold that a previously deported alien is "found in" the United States when his physical presence is discovered and noted by the immigration authorities, and the knowledge of the illegality of his presence, through the exercise of diligence typical of law enforcement authorities, can reasonably be attributed to immigration authorities.

Id. at 376 (quoting United States v. Santana-Castellano, 74 F.3d 593, 598 (5th Cir. 1996)). Applying this standard, the court concluded that immigration authorities could be attributed with actual knowledge of Gunera's illegal presence in the United States "as of September 28, 1999, when the NAILS system identified him as having a prior deportation based on a prior conviction for an aggravated felony, that inquiry having been run on the same name, same date of birth, and same country of origin as Gunera submitted in his TPS application." Id. Moreover, the court noted that Gunera's TPS application had provided an accurate U.S. address at which he could have been physically located. Id. Any missing or omitted information in the TPS application was effectively corrected by the NAILS inquiry. Id. Finally, the court pointed out that the government's October 1999 denial of Gunera's application for immigration benefits based on the same conviction that

was revealed in the September NAILS report "is a strong indicator that the Government had actual knowledge of the illegality of Gunera's presence as of that date." Id. at 377. Accordingly, the section 1326 charge brought in 2004 was ruled time-barred.

The Eighth Circuit has also found that immigration authorities had or should have had knowledge of an alien's illegal status, after having collected the alien's fingerprints. In United States v. Gomez, the defendant reentered the United States, "surreptitiously without inspection by INS officers," after having been deported. 28 F.3d at 1033. When the defendant later appeared at an INS Legalization Office to file for temporary resident alien status under a false name, immigration authorities failed to identify him. Id. On the basis of these factual findings, the Eighth Circuit concluded that the INS did not "find" the defendant at the time of his application, although he was physically present at the INS office. Id. at 1037. The court however went on to find that because immigration authorities took his fingerprints and had access to FBI facilities for fingerprint comparison, it possessed "both the information and the means necessary to determine [the defendant's] status as a deported alien." Id. The court explained that "[w]here the government is in possession of all necessary information and means, we see no reason why consistent with the rule of lenity, the 'discovery rule' governing the accrual of a cause of action for the purpose of commencing the statute of limitations should not apply." Id. In spite of these presumed failings to ascertain the defendant's deportation status, the court ultimately held that the charge under section 1326 was *not* time-barred because the earliest possible time at which the INS could have been on notice of the

defendant's status fell within the five-year statutory period. Id. at 1038.

> **b.    Cases holding that for statute of limitations purposes in section 1326 prosecutions, there is no basis for constructive knowledge where the alien's deception prevents the government from ascertaining his deportation status.**

Although most courts recognize that the theory of constructive knowledge imposes upon immigration authorities a duty to exercise "diligence typical of law enforcement authorities" in ascertaining an alien's immigration status, courts have declined to apply such a theory to find that federal immigration officials failed to act with the requisite diligence when the alien affirmatively concealed his true identity with an alias.

For example, in United States v. Bencomo-Castillo, 176 F.3d 1300, 1303 (10th Cir. 1999), the Tenth Circuit found that "[n]either the plain language of the statute nor the relevant case law suggests that the 'found in' element of § 1326(a) requires the government to exercise more than reasonable diligence in screening for previously deported aliens." In that case, the court addressed "whether an alien arrested under an alias and not discovered to be a prior deportee has been 'found' within the meaning of § 1326." Id. at 1303 (emphasis added). The defendant, Arturo Bencomo-Castillo, reentered the United States after having been convicted of a felony and deported; he was subsequently arrested again. Id. at 1302. While in the custody of local law enforcement officials, he gave a false name and was released. Id. Although his fingerprints were taken by state officials, federal immigration authorities did not detect his deportation status because they did not perform a jail check while he was in custody. Id. at 1302-03.

It was not until nearly a year later when his fingerprints were processed by the FBI that the alien's false identity was revealed. Id. at 1303. He was arrested again, on a separate offense, and while in custody identified by an INS agent as a previously deported alien. Id. The Court declined to find that the government had either constructive or actual knowledge of the defendant's prior deportation at the time of the first arrest:

> Even if an INS agent had performed a weekend jail check on or around March 23, 1996 [when Bencomo-Castillo was in the custody of local law enforcement], he probably would not have discovered Mr. Bencomo-Castillo's status because Mr. Bencomo-Castillo used an alias. Agents cannot discover information about an alien giving a false name unless they check multiple computer indexes, including the Deportable Alien Control System ("DACS") and the National Crime Information Center ("NCIC"). These systems are not checked during a routine screening unless the officer recognizes an alien as a prior deportee. Moreover, if the alien uses a new alias, the NCIC will not yield any information about him. Based on such evidence, the district court did not clearly err in finding that the INS did not identify Mr. Bencomo-Castillo as a deported alien before June 5, 1997 [when the fingerprints were matched]. We also hold that INS agents had no legal duty under § 1326 to conduct a more exhaustive investigation of his criminal history.

Id. at 1304.

Other cases also support the view that an alien's deception should not be rewarded by charging the government with constructive knowledge of the defendant's illegal presence. See, e.g., United States v. Uribe-Rios, 558 F.3d 347, 354 (4th Cir. 2009) (declining outright to "employ a theory of constructive knowledge to find that federal immigration officials in this case failed to act with 'diligence typical of law enforcement authorities' when Appellant concealed his identity with an alias"); United States v. DeLeon, 444 F.3d 41, 52-53 (1st Cir. 2006) ("[T]here can be no finding of lack of

11

diligence where it is deception by the alien as to his identity that has caused the government not to have knowledge of his presence."); United States v. Soriano-Hernandez, 310 F.3d 1099, 1103-05 (8th Cir. 2002) (holding that statute of limitations defense did not apply to a defendant who used aliases each time he was arrested which "prevented the INS from having all of the information required to bring charges against Defendant" until a later date); United States v. Mercedes, 287 F.3d 47, 54-56 (2d Cir. 2002) (denying defendant's argument that he should have been found earlier when "he was the one who attempted to deceive law enforcement officials by concealing his true identity").

Finally, at least one circuit has held that the statute of limitations in section 1326 prosecutions is tolled when the defendant flees justice, pursuant to 18 U.S.C. § 3290.[2] United States v. Rivera-Ventura, 72 F.3d 277, 281-82 (2d Cir. 1995). In Rivera-Ventura, the defendant illegally reentered the United States after having been deported. Id. at 279. He was then discovered again, and arrested by INS agents, who found him hiding in the back of a truck. Id. The INS promptly commenced deportation proceedings against him. Id. The defendant was released on bail pending his administrative hearing, having provided the INS with an address later discovered to be false. Id. When he failed to appear for the hearing, the immigration judge ordered that the matter be returned to the INS for appropriate action, though ultimately no criminal charges were filed at that time.

---

[2] 18 U.S.C. § 3290 provides: "No statute of limitations shall extend to any person fleeing from justice."

Id.  In subsequent years, the defendant was arrested by local law enforcement officials several times, but each time he escaped detection by immigration authorities by giving the local officials a false name.  Id.  When finally INS agents rearrested the defendant over seven years later and charged him with violation of section 1326, the defendant raised a statute of limitations defense.  Id.

After concluding that being "found" is a completed offense when authorities discover the illegal alien in the United States, the Second Circuit declined to give the defendant the benefit of the five-year statute of limitations.  Id. at 282.  Instead, the court found that the defendant tolled the running of the five-year limitations period by fleeing from justice.  Id.; see 18 U.S.C. § 3290.  Without resolving the question of whether the scope of "justice" as used in section 3290 extends to civil deportation proceedings, the court concluded that because the defendant also fled state criminal charges and continued to conceal his identity from INS authorities, he had tolled the effect of the section 1326 charge.  Id. at 285 ("[A]n alien who knows he is subject to criminal prosecution and who gives the INS and other law enforcement authorities false names and addresses has engaged in acts of self-concealment that may be properly be found to constitute constructive flight.").

**B.    Mendez was not "found in" the United States in 2000 for purposes of this indictment.**

There is no dispute that immigration authorities had Mendez in custody in 2000, that they knew he was an illegal alien and that they knew he had an extensive criminal

13

record under at least four aliases. The dispute is whether this amounts to actual or constructive knowledge of Mendez's immigration status with respect to section 1326 for purposes of the statute of limitations period. The Court finds that it does not. Although the government had access to Mendez's fingerprints and criminal history, there is no indication in the record that they had actual knowledge of his prior deportation after conviction for an aggravated felony. The Notice to Appear charged Mendez with being subject to removal under 8 U.S.C. § 1182. The Immigration Judge released Mendez on bond and later granted him voluntary departure. Had immigration authorities possessed actual knowledge of Mendez's true immigration status, they would have charged him under 8 U.S.C. § 1326 at the time.

   Because Mendez used an alias and clearly intended to evade detection, the Court will not assume that the immigration authorities had constructive knowledge of Mendez's true immigration status. Without ruling on the competence or diligence of immigration authorities in 2000—indeed, the government provided scant explanation for the immigration authorities' glaring failure to connect "Mauro Mendez-Santana" to the "Lorenzo Mendez-Santana" who was previously deported—the Court finds that where a defendant contributes to the government's error through his own self-concealment and evasion, application of the constructive knowledge doctrine is inappropriate. Gunera, one of only a few cited cases that actually applied a theory of constructive knowledge, is inapposite: that case involved a defendant who provided his real name, an actual address and accurate biographical data to immigration authorities. Here, Mendez consistently

14

used aliases and other false biographical information. Gomez, which is factually similar to this case, only discussed constructive knowledge in dicta. In spite of finding that access to the defendant's fingerprints was sufficient to impute knowledge, the Gomez court ultimately found the prosecution to be timely and permitted it to proceed.

The Court instead takes the view adopted by the First, Second, Fourth, Eighth and Tenth Circuits. Decisions from those courts indicate a general reluctance to "reward deceit by the alien and . . . encourage the withholding of information," DeLeon, 444 F.3d at 52. The Court accordingly declines to give Mendez the benefit of the government's error, where he played a role in the oversight. That his deception was a thin one is irrelevant.[3] Rather, the central fact is that Mendez deceived. As the Second Circuit reasoned in Mercedes, "[i]t is difficult not to find [Defendant's] claim regarding the [statute of limitations] disingenuous when he was the one who attempted to deceive law enforcement officials by concealing his true identity." Mercedes, 287 F.3d at 55. Thus, the Court holds that Mendez was not "found in" the United States in 2000 because he was not discovered and identified by the immigration authorities as the same man who had previously been deported, and that Mendez's deception forecloses invocation of the statute of limitations.[4]

---

[3] Mendez's counsel emphasized that the name Mendez provided immigration authorities in 2000 was practically identical to his true name, and was thus easily overcome with more investigation. Counsel also suggested at oral argument that the alias could have been merely a nickname rather than an effort to deceive. This is not credible given Mendez's history of using aliases and his possession of two drivers licenses for both names in 2008.

[4] The government argues only that the statute of limitations is unavailable to persons "fleeing from justice." See 18 U.S.C. § 3290 (1994). The government argues that Mendez's use of an

15

## IV.  CONCLUSION

For the reasons set forth above, as well as the reasons stated at the April 27, 2009 hearing,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's December 9, 2008 Motion to Withdraw Plea of Guilty and Motion to Dismiss Indictment **[Dct. # 13]** is DENIED.

                                                            s/Gerald E. Rosen
                                                            Chief Judge, United States District Court

Dated: May 21, 2009

---

alias and subsequent failure to voluntarily depart constituted such a flight.  The record however is insufficient to support this argument.  A person flees from justice when he realizes that there is a high probability that he will be prosecuted for a crime and conceals himself with the intent to avoid prosecution.  See, e.g., Streep v. United States, 160 U.S. 128, 40 L. Ed. 365, 16 S. Ct. 244 (1895).  The government must show flight by a preponderance of the evidence.  United States v. Greever, 134 F.3d 777, 780 (6th Cir. 1998).  In holding that the defendant in Greever had in fact been intending to avoid prosecution, the Sixth Circuit relied on the following findings made by the district court: (1) the defendant had concealed himself; (2) the government had searched for him to no avail; (3) the defendant had lied to officers about his identity at a bar; (4) the defendant had stated that he had not renewed his driver's license or held a job for fear that the agents would be able to find him; (5) the defendant had admitted to officers that he had been playing a game of cat and mouse with them. Greever, 134 F.3d at 780.  To make such findings in this case would require speculation; the Court declines to do so here.

      I hereby certify that a copy of the foregoing document was served upon counsel of record on May 21, 2009, by electronic and/or ordinary mail.

                                        s/Ruth A. Brissaud
                                        Case Manager
                                        (313) 234-5137